**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RANCE ANDREW MACFARLAND, JR.<br><br>        Debtor. | Chapter 7<br><br>Case No.: 19-10061-MEW |
| PIZZAROTTI NY, LLC, on behalf of itself and as a member of PIZZAROTTI LLC, and PIZZAROTTI LLC,<br><br>        Plaintiffs,<br><br>        v.<br><br>RANCE ANDREW MACFARLAND, JR.,<br><br>        Defendant. | Adv. Proc. No. |

**ADVERSARY COMPLAINT PURSUANT TO 11 U.S.C. §523 OBJECTING TO DISCHARGEABILITY OF A PARTICULAR DEBT AND 11 U.S.C. §727 OBJECTING TO THE DEBTOR'S DISCHARGE**

Plaintiffs, Pizzarotti NY, LLC, on behalf of itself and as a member of Pizzarotti LLC, and Pizzarotti LLC (sometimes referred to herein as the "Company") (collectively, "Pizzarotti"), by and through their attorneys, Walsh Pizzi O'Reilly Falanga LLP, by way of complaint (the "Complaint") against the defendant/debtor, Rance Andrew MacFarland, Jr. (the "Debtor" or "MacFarland"), says:

**JURISDICTION AND VENUE**

1. This adversary proceeding arises in and is related to the bankruptcy case filed on January 7, 2019 in the United States Bankruptcy Court for the Southern District of New York under chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq., and captioned In re Rance Andrew Macfarland, Jr., Bankr. Case No. 19-10061 (MEW).

2. On March 6, 2019, the case was converted to one under chapter 7 in response to an uncontested motion filed by the United States Trustee.

3. This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

4. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) (I) & (J).

5. Venue is proper pursuant to 28 U.S.C. § 1409(a).

6. Pizzarotti consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## NATURE OF ACTION

7. This adversary proceeding is brought pursuant to 11 U.S.C. § 523, objecting to the dischargeability of particular debts owed by the Debtor to Pizzarotti and 11 U.S.C. § 727, objecting to the Debtor's discharge.

## PARTIES

8. The Pizzarotti Group is a global group of affiliated construction services companies located in more than 20 markets around the world.

9. Pizzarotti NY, LLC is a majority member of Pizzarotti LLC, a privately-owned construction company providing services on construction projects in the New York City area.

10. Pizzarotti LLC is a limited liability company organized under the laws of the State of Delaware and registered to do business in the State of New York.

11. The Debtor is a former owner/member of Pizzarotti LLC and was formerly employed as its first CEO.

12. Upon information and belief, at the time the Debtor filed for bankruptcy the Debtor was a resident of New York, New York.

## FACTS RELEVANT TO ALL COUNTS

13. The Pizzarotti Group began in 1910 as a private, family-owned construction

company, operated from Parma, Italy, and since has grown into one of the most renowned and trusted construction conglomerates in Italy and Europe, altogether.

14.     Its primary area of construction activity in Italy and abroad is transport infrastructure projects, *e.g.* roads, highways, railways, subways, airports and ports.  The Pizzarotti Group has also designed and built many other major projects including hospitals, hotels, government and academic institutions, commercial office buildings, residential buildings and a theme park.

15.     Beginning in or around 2013, the Pizzarotti Group, looking to expand its business to the United States, specifically the New York City area, began searching for a partner with significant experience and relationships in the local New York City construction market.

16.     In January 2015, the Pizzarotti Group formed Pizzarotti NY, LLC and partnered with the Debtor and his business partner, Frank DeGrande, to form Pizzarotti-IBC, LLC (the "Company")[1] (the "Transaction").

17.     Prior to partnering with Pizzarotti NY, LLC, the Debtor and his business partner, Frank DeGrande, owned IBC Business Groups LLC ("IBC"), a small-size construction management services company that performed construction management services doing primarily residential projects in New York City.

18.     According to the terms of the deal, Pizzarotti NY, LLC would contribute the initial capital contribution to Pizzarotti LLC and the Debtor and DeGrande would contribute certain projects of IBC to the Company.

### *The Company*

19.     The Debtor owned 20% of the Company, DeGrande owned 20%, and Pizzarotti NY, LLC owned 60% (the "Founding Owners").

---
[1] Effective August 1, 2017, the Company changed its name from Pizzarotti IBC, LLC to Pizzarotti, LLC.

20. The Debtor was also appointed as Company's first Chief Executive Officer due to his professed skills and knowledge of the local market.

21. Pizzarotti NY, LLC invested significantly in the Company in an effort to establish the new company as worthy of the Pizzarotti Group's global brand and reputation as a highly capable, family-owned construction company that consistently delivers large construction projects worldwide, often involving a grand scale and complex design.

22. The Company's purpose, as set forth in its Operating Agreement, was the "research, identification and implementation of any Business Opportunity in the State of New York and New Jersey . . . ."

23. "Business Opportunity" is defined in the Operating Agreement as:

> Any opportunity for a construction and/or development project to be performed in any location in the State of New York and/or the State of New Jersey, including construction, and development projects in the residential, office, industrial, hospitality, leisure and/or commercial sectors, as well as projects concerning infrastructures and public works.

24. The Operating Agreement established that Pizzarotti NY, LLC was to contribute $600,000 cash as its initial contribution to the Company and MacFarland and DeGrande would contribute "a substantial portion of the business of IBC Groups."

25. Specifically, MacFarland and DeGrande agreed to contribute certain "IBC Projects and Proposals," identified on Schedule A to the Operating Agreement, as well as IBC's "Existing Business Rights," to the Company," which, according the Operating Agreement, had a fair market value of $400,000.

26. IBC's Existing Business Rights are defined in the Operating Agreement as:

> All of IBC's and its affiliates [sic] right, title and interest in and to the assets, properties, rights, privileges, goodwill, contracts and claims of every kind or description, wherever located, whether tangible or intangible, real, personal or mixed, relating to all or part of the business operations of IBC and its affiliates, including, without limitation IBC Projects and Proposals and (i) all

contracts, licenses, franchises, certificates, authorizations, approvals, variances and permits issued or approved by any governmental authority and relating to the development, operation, ownership, maintenance and use of any construction or development project in the State of New York and the State of New Jersey, including, without limitation, the IBC Projects and Proposals; (iii) all architectural plans and specifications (including all design drawings and concept plans), engineering reports (structural and mechanical), as built-drawings, surveys, other development plans and site plans and all environmental, zoning feasibility and other reports relating to the condition and development of such projects, all to the extent assignable; (iv) any and all goodwill associated with IBC and its affiliates; and (v) all other documents and other work product related to the business operations of IBC and its affiliates whether in hard copy or in electronic format.[2]

27. The Operating Agreement also includes "exclusivity" provisions, pursuant to which each of the Company's Founding Owners agreed that, within the boundaries of the states of New York and New Jersey, it/he would perform activities exclusively for the Company, and would not perform any activities that in any way whatsoever competed with the Company's opportunities.

28. Pursuant to the Operating Agreement, after the establishment of the Company, IBC's sole activity was to complete the few projects excluded from the Transaction, identified in Schedule A to the Operating Agreement; and MacFarland and DeGrande agreed to use their best efforts to cause IBC to terminate its operation and dissolve itself within twelve (12) months from the closing date.[3]

29. The Operating Agreement also provides that the Debtor, as Chief Executive Officer,

---

[2] Excluded from IBC's "Existing Business Rights" were any: (i) accounts receivable, liabilities or obligations of IBC and its affiliates existing on or before the Closing (as defined therein), whether the same relate to the IBC Projects and Proposals or otherwise; (ii) the available cash of IBC at Closing, and (iii) the accounts receivable and income from the IBC projects listed in Schedule A attached hereto, under the title "IBC projects not yet finalized," which shall remain exclusively with IBC and its affiliates. It being understood and agreed that the only employment relationships that are going to be transferred from IBC to the Company are those listed in Schedule B attached hereto.

[3] "Closing" is defined in the Operating Agreement to mean: (i) the transfer of the IBC Existing Business Rights to the Company, (ii) the full payment of each Initial Capital Contribution that – in accordance with the provisions of this Agreement – shall take place on the Closing Date, (iii) the execution by and between the Company and the Executives of the Employment Agreements, as well as (iv) any other action or transaction that, in accordance with the applicable provisions of this Agreement, shall occur on the Closing Date; it being understood and agreed that all actions and transactions to be performed at Closing in accordance with the applicable provisions of this Agreement shall be regarded as a single transaction so that none of such actions or transactions shall be deemed to have taken place as provided in this Agreement.

shall serve this role "with the responsibilities, duties and authority customary for such position."

30. In addition, the Operating Agreement provided that, as a condition of the Transaction, the Debtor enter into an employment agreement (the "Employment Agreement"), which included the covenants the Company now seeks to enforce. The Operating Agreement expressly states that "the Parties acknowledge and declare the essential nature of the above provision."

31. The covenants fall into three categories – non-competition, non-solicitation and confidentiality.

32. The covenants are enforceable for a period of twelve (12) months after the Debtor's termination from the Company.

33. Under the Employment Agreement, the Debtor was paid a six-figure base salary and received other benefits and perquisites in connection with his leadership position.

### *The Debtor's Mismanagement, Unlawful Conduct and Fraudulent Scheme*

34. Unbeknownst to Pizzarotti, in his role as CEO of the new company, the Debtor was later found to be mismanaging and operating the Company in a manner that was in material breach of the Operating Agreement.

35. By way of example and not by limitation, Pizzarotti NY, LLC learned that the Debtor had misappropriated Company resources by, *among other things,* paying his personal expenses by wrongfully charging personal expenses to Company credit cards. The Debtor also attempted to enhance his own business reputation as opposed to, and at the expense of, the Company's reputation and committed to contracts without obtaining the requisite approval from the Company's Board of Directors; thereby preventing, or otherwise interfering with, the Board's oversight of the contracts.

36. The Debtor's misconduct caused problems for the Company that resulted in significant damages, including, but not limited to, (i) delays in (or lack of) collection of payments from clients; (ii) busts on project budgets; (iii) waste of resources; (iv) concealing critical information

on projects from Pizzarotti NY, LLC representatives in the Company Board; (v) delays on projects; (vi) unnecessary payments to vendors, and subcontractors; and (vii) other ramifications arising from the commitments to owners and developers that the debtor failed to disclose to the Company Board.

37. As a result, Pizzarotti has incurred, and continues to incur, financial costs to find and fix problems arising from the Debtor's misfeasance and nonfeasance.

38. In addition, the Debtor breached the Company's Operating Agreement and defrauded the Company by: (i) engaging in business outside the scope of the Operating Agreement; (ii) conducting business on behalf of the Company without authority or permission of the Board; (iii) performing extraordinary administration activities, such as engaging in financial transactions, entering into joint ventures, entering into purchase agreements without authority or permission of (or even informing) the Board; (iv) engaging in business practices that he knew, or should have known, would harm the Company, such as committing the Company to certain obligations that are not reflected in written agreements; (v) failing to meet his obligations to wind down IBC and to satisfy IBC liabilities excluded from the sale, which triggered numerous lawsuits seeking payment from the Company and as a result of which the Company incurred substantial attorneys' fees and costs; (vi) mismanaging projects; (vii) charging personal expenses of a dubious nature to the Company; (viii) buying awkward advertising space in sports publications as well as hospitality sets (tickets for events) for no apparent benefit to the Company; (ix) failing to properly cause the Company's licenses and permits (in particular the General Contractor's license with the NY Department of Building) to be assigned or transferred to the Company; (x) failing to follow the Company's policies and procures regarding making commitments to Company employees, such that he promised egregious benefits and/or bonuses to Company employees that were not in accordance with the Company's policy and of which the proper people at the Company were unaware; and (xi) causing substantial harm to the Company by damaging its image in the New York City market, which was especially susceptible

considering the Pizzarotti Group was just emerging in that geographic area.

39. As a result of the Debtor's breaches of his fiduciary duties to the Company, misconduct, and fraud, Pizzarotti was damaged and the Debtor is obligated to reimburse Pizzarotti for its expenses and damages incurred as a result of those acts.

40. In March 2017, after Pizzarotti gathered enough evidence of the Debtor's misdeeds, which he, for the most part admitted, it resolved to terminate him for "cause".

41. However, the Company agreed to enter into a separation agreement with the Debtor (the "Separation Agreement").

42. The Company then purchased the Debtor's interest in the Company and appointed Marco Martegiani to CEO.

43. Thereafter, the Debtor violated the post-employment covenants to which he first agreed as a condition of Pizzarotti NY, LLC's entering into the Transaction, and which he reaffirmed as part of his involuntary separation from the Company.

44. Indeed, barely a month after signing a separation agreement with the Company, in April 2017, the Debtor secured employment as President of a competitor construction company in New York City, McKissack & McKissack ("McKissack").

45. In an interview publicizing his leadership role with McKissack, MacFarland stated that his goal was to grow McKissack's construction business in the New York area.

46. The Debtor's position with McKissack was a flagrant and material breach of his continuing obligations under his Employment Agreement with the Company, which included covenants that survive the termination of his employment and prevented him from competing with the Company, as well as the Separation Agreement.

47. The Debtor has also materially breached the Separation Agreement by failing to make the Quarterly Payments due and owing thereunder to the Company.

48. The Quarterly Payments due under the Separation Agreement are in the amount of $12,5000/quarter and were supposed to commence January 2018. The Quarterly Payments constitute repayment of money loaned to the Debtor ($200,000 plus interest) prior to the Debtor's separation from the Company to satisfy outstanding IBC debts.

49. In order to induce the Pizzarotti to lend him money, the Debtor made certain promises to the Pizzarotti, such as pledging receivables that were allegedly due IBC.

50. However, the pledged receivables never materialized and none of the loans were repaid.

51. Upon information and belief, the Debtor has also breached the Separation Agreement by disclosing the Company's confidential information to McKissack, soliciting and hiring the Company's employees, and usurping the Company's business opportunities in favor of McKissack.

52. Furthermore, the Debtor has not been cooperative with the Company, as required by the Separation Agreement. For example, the Debtor refused to cooperate with the Company to secure the assignment and transfer of various licenses and permits, which he failed to do when he was employed by the Company, rendering it necessary for the Company to pay him additional "consulting fees" in exchange for his cooperation or otherwise jeopardize active projects.

53. The releases contained in the Separation Agreement are now waived and not enforceable as a result of the Debtor's breach of the Separation Agreement.

54. As a result of the Debtor's breaches of the Separation Agreement and other wrongful conduct after his termination from the Company, Pizzarotti has been damaged.

55. On October 1, 2018, the Company filed a lawsuit in the Supreme Court of New York, seeking to enjoin the Debtor from continuing to breach his post-employment covenants and to recover damages it incurred as a result of the Debtor's breach of the Employment Agreement, the Company's Operating Agreement and the Separation Agreement as well as for breach of the duty of

good faith and fair dealing, breach of fiduciary duty, tortious interference with the Company's business relationships, unfair competition, unjust enrichment and indemnification.

56. On January 7, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

57. On March 6, 2019, the case was converted to one under chapter 7 in response to an uncontested motion (the "Motion to Convert") filed by the United States Trustee.

58. The Declaration of Benjamin J. Higgins filed in support of the Trustee's Motion to Convert states that, based on the Trustee's review of the Docket and the documents filed in the case, the Debtor has not filed schedules other than Schedule E/F, has not filed a summary of assets and liabilities, a statement of financial affairs, or an affidavit pursuant to Local Bankruptcy Rule 1007-2.

59. The Higgins Declaration also indicates that the Debtor's counsel did not respond to requests for documents and information and an interview from the U.S. Trustee's Office and the Debtor failed to attend a phone interview and the case conference.

60. On July 3, 2019, the Chapter 7 Trustee filed a Motion for Extension of Time to Object to Discharge [Doc. 26].

61. In the Chapter 7 Trustee's motion, the Trustee indicates that on March 13, 2019 and April 4, 2019, she requested the Debtor file his missing schedules and statement of financial affairs and provide the Trustee with certain financial information and documentation.

62. Apparently the Debtor responded to the Trustee indicating that he was residing in Puerto Rico and that he intended to seek dismissal of his case and retain new counsel.

63. The Trustee then sought and obtained an Order directing the Debtor's counsel to turn over to the Trustee all non-privileged records concerning the Debtor, including any books, documents, records and papers relating to the Debtor's property or financial affairs.

64. The Debtor still has not filed his missing schedules or a statement of financial affairs or, according to the Trustee's recent motion, provided the Trustee with any information requested by her and is in default of the June 4, 2019 Order.

65. The Trustee further indicates she has not been contacted by the Debtor's counsel or new counsel and that counsel has not turned over any documents and is also in violation of the June 4, 2019 Order.

66. The Trustee also notes in her motion that the Debtor failed to appear at the 341 meeting of creditors on May 6, 2019 and the continued 341 meeting of creditors on June 13, 2019.

67. According to the limited amount of information contained in the Debtor's petition and Schedule E/F, there will be no funds available for any distribution to unsecured creditors.

## COUNT I
### (Non-Dischargeability Pursuant to 11 U.S.C. § 523(a))

68. Pizzarotti repeats and reiterates the foregoing allegations as if the same were fully set forth at length herein.

69. The Debtor breached the Company's Operating Agreement and defrauded the Company by: (i) engaging in business outside the scope of the Operating Agreement; (ii) conducting business on behalf of the Company without authority or permission of the Board; (iii) performing extraordinary administration activities, such as engaging in financial transactions, entering into joint ventures, entering into purchase agreements without authority or permission of (or even informing) the Board; (iv) engaging in business practices that he knew, or should have known, would harm the Company, such as committing the Company to certain obligations that are not reflected in written agreements; (v) failing to meet his obligations to wind down IBC and to satisfy IBC liabilities excluded from the sale, which triggered numerous lawsuits seeking payment from the Company and as a result of which the Company incurred substantial attorneys' fees and costs; (vi) mismanaging projects; (vii) charging personal expenses of a dubious nature to the Company; (viii) buying awkward advertising space in sports

publications as well as hospitality sets (tickets for events) for no apparent benefit to the Company; (ix) failing to properly cause the Company's licenses and permits (in particular the General Contractor's license with the NY Department of Building) to be assigned or transferred to the Company; (x) failing to follow the Company's policies and procures regarding making commitments to Company employees, such that he promised egregious benefits and/or bonuses to Company employees that were not in accordance with the Company's policy and of which the proper people at the Company were unaware; and (xi) causing substantial harm to the Company by damaging its image in the New York City Market, which was especially susceptible considering the Pizzarotti Group was just emerging in that geographic area.

70. Pursuant to the Company's Operating Agreement, the Debtor agreed that, within the boundaries of the State of New York and New Jersey, he would perform activities exclusively for the Company, and would not perform any activities that in any way whatsoever either directly or indirectly competed with the Company.

71. The Debtor also agreed to perform his duties as Chief Executive Officer of the company with the responsibilities, duties and authority customary for such position.

72. In reliance on the Debtor's promises to fulfill these fiduciary duties and obligations and to perform his job as Chief Executive Officer, Pizzarotti loaned money to the Debtor that was never repaid and allowed the Debtor the access and freedom he required to carry out a fraudulent scheme designed defraud Pizzarotti, as described in detail herein.

73. The Debtor possessed wrongful intent when engaging in this fraudulent scheme.

74. The Debtor's fraudulent scheme included, without limitation, misappropriating the Company's resources to pay the Debtor's personal expenses, fraudulently inducing Pizzarotti to lend him money that he never intended to repay, and engaging in misconduct that benefited him personally at the expense of the Company.

75. In addition, the Debtor fraudulently induced Pizzarotti to enter into a Separation Agreement that released him from liability, among other benefits, with which he never intended to comply.

76. The Debtor's fraudulent conduct as an owner and the CEO of the Company constitutes actual fraud in the form of a fraudulent scheme.

77. The foregoing conduct of the Debtor is violative of to 11 U.S.C. § 523(a)(2) and/or to 11 U.S.C. § 523(a)(4) in that, by virtue of the foregoing, the Debtor obtained money and property from Pizzarotti by false pretenses, a false representation, and/or actual fraud and/or fraud or defalcation while acting in a fiduciary capacity, embezzlement and/or larceny.

78. Pizzarotti has been damaged.

79. Pizzarotti's damages constitute a nondischargeable debt of the Debtor under § 523(a)(2) and/or (a)(4).

## COUNT II
## 11 U.S.C. 727

80. Pizzarotti repeats and reiterates the foregoing allegations as if the same were fully set forth at length herein.

81. The Debtor has failed to file his complete schedules or statement of financial affairs, has failed to appear for the meeting of creditors, and has failed to provide the Trustee with the financial information and documents she requested.

82. Accordingly, the Debtor is concealing and/or withholding documents and other information from which his financial condition or business transaction might be ascertained.

83. The Debtor has also failed to obey a court order.

84. Due to the foregoing violations of Section 727, Pizzarotti is unable to determine at this time, whether any other violations of Section 727 have occurred.

85. Accordingly, Pizzarotti reserves the right to amend the Complaint to object to the discharge of the Debtor at such time as may be appropriate.

## COUNT III
## (For an Award of Attorneys' Fees & Costs)

86. Pizzarotti repeats and reiterates the foregoing allegations as if the same were fully set forth at length herein.

87. Pizzarotti should be awarded its reasonable attorneys' fees and costs incurred in

prosecuting the within adversary proceeding.

WHEREFORE, Pizzarotti demands judgment declaring its particular debts in the amount to be determined at trial nondischargeable pursuant to 11 U.S.C. § 523(a)(2) and/or 11 U.S.C. §523(a)(4), reserves the right to object to the Debtor's discharge pursuant to 11 U.S.C. § 727, and for such further other and further relief as is just, including reasonable costs and attorneys' fees.

**WALSH PIZZI O'REILLY FALANGA LLP**

By: */s/ Sydney J. Darling*
Sydney J. Darling
Stephen V. Falanga
140 Broadway, 6th Floor
New York, New York 10005
(973) 757-1100

Dated: July 8, 2019

*Attorneys for Pizzarotti LLC and Pizzarotti NY, LLC*